# EXHIBIT B

1  JOSEPH W. COTCHETT (SBN 36324)
   jcotchett@cpmlegal.com
2  MARK C. MOLUMPHY (SBN 168009)
   mmolumphy@cpmlegal.com
3  ANNE MARIE MURPHY (SBN 202540)
   amurphy@cpmlegal.com
4  GWENDOLYN R. GIBLIN (SBN 181973)
   ggiblin@cpmlegal.com
5  **COTCHETT, PITRE & McCARTHY, LLP**
   840 Malcolm Road
6  Burlingame, California  94010
   Telephone:     (650) 697-6000
7  Facsimile:      (650) 692-3606

8  *Attorneys for Plaintiff*

**FILED**
SAN MATEO COUNTY

JUL 1 4 2016

Clerk of the Superior Court
By
DEPUTY CLERK

9              **SUPERIOR COURT OF CALIFORNIA**

10           **IN AND FOR THE COUNTY OF SAN MATEO**

11

12  **BROADWAY GRILL, INC.**, a California          CASE NO.   **16CIV00392**
    Corporation, on behalf of itself and all others
13  similarly situated,                             **CLASS ACTION COMPLAINT:**

14              Plaintiff,                          1.  **VIOLATIONS OF THE**
                                                        **CARTWRIGHT ACT (CAL. BUS.**
15       v.                                             **& PROF. CODE § 16720** *et seq.*)**;**
                                                    2.  **UNLAWFUL BUSINESS**
16  **VISA, INC.**, a Delaware Corporation, **VISA**    **PRACTICES (CAL. BUS. & PROF.**
    **INTERNATIONAL ASSOCIATION**, and             **CODE § 17200,** *et. seq.*)**;**
17  **VISA U.S.A., INC.**, a Delaware Corporation   3.  **UNFAIR BUSINESS PRACTICES**
    and DOES 1-500.                                     **(CAL. BUS. & PROF. CODE §**
18                                                      **17200,** *et. seq.*)**;**

19              Defendants.
                                                    **DEMAND FOR JURY TRIAL**
20

21

22

23

24       16 – CIV – 00392
         CMP
25       Complaint Filed
         107939
26

27

28

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP
                   **CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................... 1

II.   THE PARTIES ........................................................................................................... 2

    A.    Plaintiff ............................................................................................................ 2

    B.    Defendants ....................................................................................................... 3

        1.    Defendant Visa Inc. ........................................................................... 3

        2.    Defendant Visa International Association ...................................... 3

        3.    Defendant Visa U.S.A. Inc. .............................................................. 4

    C.    Co-Conspirators ............................................................................................. 4

    D.    Doe Defendants .............................................................................................. 5

    E.    Agency, Aiding and Abetting and Common Enterprise ......................... 5

    F.    Alter Ego ......................................................................................................... 6

III.  JURISDICTION AND VENUE ............................................................................. 6

IV.   GLOSSARY OF RELEVANT TERMS ................................................................ 6

    A.    Types of Cards ............................................................................................... 7

    B.    General Industry Terms ............................................................................... 8

    C.    Markets .......................................................................................................... 10

    D.    Relevant Rules of Visa and its Co-conspirators .................................... 10

V.    TRADE AND COMMERCE ................................................................................ 11

VI.   INJURY TO COMPETITION ............................................................................. 11

VII.  FACTUAL ALLEGATIONS ................................................................................ 12

    A.    History of Visa Defendants ........................................................................ 12

    B.    Summary of Relevant Facts Regarding Credit Card Transactions And History of Competition ................................................................................ 14

        1.    How Credit Card Transactions Work ........................................... 14

        2.    Merchant Concern With Card Acceptance Fees ......................... 15

        3.    Growth of Anticompetitive Conduct in the Setting of Interchange Fees ..... 15

        4.    Networks Adopt Uniform Anti-Competitive Rules .................... 18

CLASS ACTION COMPLAINT                                    i

VIII.   *AMERICAN PIPE* TOLLING APPLLIES .................................................................19

IX.   **CLASS ALLEGATIONS** ...........................................................................................20

X.   **CAUSES OF ACTION** ...............................................................................................22

FIRST CAUSE OF ACTION
Violation of California Antitrust Law
(On Behalf of Plaintiff and Class)
(Against All Defendants) ...........................................................................................22

SECOND CAUSE OF ACTION
Violation of California Business And Professions Code § 17200, *Et Seq.*
Unlawful Business Acts And Practices
(On Behalf of Plaintiff And Class) ...........................................................................24

THIRD CAUSE OF ACTION
Violation of California Business And Professions Code § 17200, *Et Seq.*
Unfair Business Acts And Practices
(On Behalf of Plaintiff And Class)
(Against All Defendants) ...........................................................................................25

PRAYER FOR RELIEF ...........................................................................................26

JURY DEMAND .......................................................................................................26

1    Plaintiff Broadway Grill, Inc. (herein after referred to as "Plaintiff"), by and through its

2   attorneys, brings this action on behalf of itself and all other similarly situated California merchants

3   against Visa Inc., Visa, U.S.A. Inc. and Visa International Service Association (collectively

4   "Visa"); and Does 1 through 500, inclusively (referred to herein as "Defendants") under the

5   California Antitrust Law (Cartwright Act, Cal. Bus. & Prof. Code §§16700 et seq.)  This

6   Complaint seeks monetary relief only.

7    Plaintiff alleges as follows:

8   **I.    INTRODUCTION**

9    1.    Visa has one unmitigated goal: to eliminate cash based transactions with card

10   transactions, and thereby take a cut on every single dollar spent by consumers, including every

11   merchant transaction in the State of California.

12    2.    Credit card transactions cost merchants an average of six times more than cash

13   transactions because of the hefty fees credit card companies and banks impose on credit

14   transactions.[1]

15    3.    As a direct result of Visa's anti-competitive rules, most consumers are entirely

16   unaware of the burdens placed on merchants by choice of payment decisions.  Visa incentivizes its

17   cardholders to use the products that are the most costly for merchants, thereby causing billions in

18   damages to California merchants.

19    4.    This is a civil antitrust action challenging illegal, horizontal agreements entered into

20   by Visa and its member banks restraining trade in the general-purpose credit card services market

21   in the State of California under California's Antitrust Law, as well as an action for unfair and

22   unlawful business practices under California's Unfair Competition Law.  Defendants Visa Inc.,

23   Visa U.S.A. Inc. and Visa International Service Association, along with their co- conspirator

24   member banks (known as issuing and acquiring banks) have illegally agreed:

25

26

27   [1] *See*, Merchant Restraints: Credit-Card-Transaction Surcharging and Interchange-Fee Regulation in the Wake of
Landmark Industry Changes, Samuel J. Merchant, Oklahoma Law Review, January 1, 2016. Available at:

28   http://digitalcommons.law.ou.edu/cgi/viewcontent.cgi?article=1022&context=olr  (last visited July 5, 2016);
ARTICLE: Priceless? The Economic Costs of Credit Card Merchant Restraints, 55 UCLA L. Rev. 1321, 1323-1324.

**CLASS ACTION COMPLAINT**                                                              1

(1)     To fix, set and enforce interchange fees associated with general and premium credit cards paid by retail merchants such as Plaintiff to Defendants and to their member banks;

(2)     To eliminate Plaintiff's and other merchants' ability to negotiate lower interchange fees through a set of merchant restraints incorporated in Visa association rules known as the "No Surcharge Rule," "Honor-All-Cards Rule," "All Outlets Rule," "No By-pass Rule" and "No Multi-Issuer Rule."

(3)     To unlawfully tie together credit card products and separate network services.

5.     These horizontal restraints have restricted competition in the relevant market and have allowed Visa to extract supracompetitive, artificially inflated interchange fees from Plaintiff and other retail merchants. On behalf of the Class, Plaintiff seeks damages and/or restitution from January 1, 2004 to the date of Class Certification, individually Plaintiff seeks damages and/or restitution from the time that he contracted to accept Visa and other branded cards (September 6, 2006).

## II.     THE PARTIES

### A.     PLAINTIFF

6.     Broadway Grill, Inc. (the "Broadway Grill") is a California Corporation with its principal place of business at 1400 Broadway Avenue, Burlingame, California 94010 (San Mateo County).  The Broadway Grill is an up-scale eating establishment and bar with live musical performances.  The Broadway Grill accepts Visa payment cards as payment for goods and services, along with cards issued by Visa co-conspirator MasterCard.  Like all other merchants who accept Visa, the Broadway Grill is bound by Visa's rules and regulations.[2]  Plaintiff has paid supracompetitive, artificially inflated interchange fees to members of the illegal conspiracy as set

---

[2] See, e.g., Card Acceptance Guidelines for Visa Merchants (2015), available at: https://usa.visa.com/dam/VCOM/download/merchants/card-acceptance-guidelines-for-merchants.pdf (last visited July 3, 2016); Visa Core Rules and Visa Product and Service Rules (2015), available at: https://usa.visa.com/dam/VCOM/download/about-visa/15-April-2015-Visa-Rules-Public.pdf (last visited July 3, 2016).

1   forth more fully below, and has sustained injury and damage as a result of the unlawful conduct of

2   Defendants and their co-conspirators, including MasterCard.

3   **B.   DEFENDANTS**

4   7.   Visa is a national bank card association whose members include several thousand

5   separate business entities that use Visa to set limitations on competition and who in return enforce

6   these restrictions on their retail customers like Plaintiff.  All three Defendants are and have been

7   active participants in the illegal activity alleged below, and are collectively referred to in this

8   Complaint as "Visa."

9   **1.   Defendant Visa Inc.**

10   8.   Defendant Visa Inc.'s principal place of business is 900 Metro Center Boulevard

11   Foster City, California (San Mateo County).  Visa Inc. operates a retail electronic payments

12   network and manages global financial services. Visa Inc. conducts commerce through the transfer

13   of value and information among financial institutions, merchants, consumers, businesses and

14   government entities.  It is the parent of Defendant Visa International Service Association and

15   Defendant Visa U.S.A., Inc.

16   **2.   Defendant Visa International Association**

17   9.   Defendant Visa International Service Association was founded in 1974 and is

18   headquartered at 900 Metro Center Boulevard in Foster City, California (San Mateo County). Visa

19   International Service Association operates as a subsidiary of Visa Inc.  Visa International Service

20   Association owns and operates a retail electronic payments network. It facilitates commerce

21   through the transfer of value and information among financial institutions, merchants, consumers,

22   businesses, and government entities. The company owns and operates VisaNet, a global processing

23   platform that provides transaction processing services, primarily authorization, clearing, and

24   settlement, as well as related value-added services. It offers a range of branded payments product

25   platforms, which customers use to offer credit, charge, deferred debit, debit, and prepaid payments,

26   as well as cash access programs for cardholders. The company owns a range of payment brands,

27   including Visa, Visa Electron, PLUS, and Interlink that are licensed to customers for use in their

28   payment programs.

### 3. Defendant Visa U.S.A. Inc.

10.    Defendant Visa U.S.A. Inc. was founded in 1970 and is headquartered at 900 Metro Center Boulevard in Foster City, California (San Mateo County). Visa U.S.A. Inc. operates as a subsidiary of Visa Inc. Defendant Visa U.S.A. Inc., a payments technology company, operates a retail electronic payments network in the United States. It also administers Visa payment programs. The company product platform includes consumer credit, consumer debit and cash access, and prepaid and commercial programs. It offers products and services over a secure payments network to support payment programs offered by its member financial institutions to their consumer, commercial, and merchant customers. Visa U.S.A. Inc. was formerly known as National BankAmericard, Inc. and changed its name to Visa U.S.A. Inc. in January, 1977.

### C. CO-CONSPIRATORS

11.    Visa and its Co-Conspirators operate as separate and distinct entities. Visa's co-conspirators include the banks and financial institutions that issue Visa-branded cards to consumers, and the acquiring banks, which acquire business from merchants, and offer network services to merchants. All agree to follow and enforce Visa's network rules—including enforcement of those rules on merchants. Visa's Co-conspirators also include other general purpose credit and charge card networks, including MasterCard, which formulate its own network rules to operate in tandem with Visa's network rules in an effort to maintain Interchange Fees at supracompetitive levels.

12.    Visa and its co-conspirators have agreed to fix Interchange fees charged to merchants though the imposition of illegal restraints that impose all or nothing choices on merchants. Merchants are faced with accepting all of the onerous network conditions or not accepting credit cards at all, which would put the merchants out of business.

13.    Initially it has been the purpose and goal of Visa and its co-conspirators to insulate the rate of Interchange Fees from competitive forces. The actions of Visa and its co-conspirators are intentional and made with the knowledge that they are anti-competitive. Visa and its co-conspirators are both participants and beneficiaries of the conspiracy, which is in all respects illegal under California's Cartwright Act.

14.    Visa and its co-conspirators work in concert to prohibit merchants from surcharging consumers for the true costs of payment products, including, but not limited to, premium products. They also work in concert to prohibit merchants from expressing preferences for one form of payment product (or form of payment) over the other and from communicating to customers that merchants are in fact bearing the cost of benefit and rewards programs.

**D.    DOE DEFENDANTS**

15.    Plaintiff is ignorant of the names of those Defendants sued as DOES 1 through 500 and for that reason has sued Defendants by fictitious names.  Plaintiff further alleges that each of said Doe Defendants is in some manner responsible for the acts and occurrences hereinafter set forth.  Plaintiff will seek leave of the court to amend this Complaint to show their true names and capacities when the Doe Defendants are ascertained, as well as the manner in which each Doe Defendant is responsible for the damages sustained by Plaintiff.

**E.    AGENCY, AIDING AND ABETTING AND COMMON ENTERPRISE**

16.    At all relevant times, each Defendant was and is the agent of each of the remaining Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency.  Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants.

17.    Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes, and transactions alleged in this Complaint.

18.    Defendants, and each of them, have participated in a common enterprise as members or acted with or in furtherance of it, or aided or assisted in carrying out its purposes alleged in this Complaint, and have performed acts and made statements in furtherance of the violations and conspiracy.

19.    Defendants, and each of them, pursued a conspiracy, common enterprise and/or common course of conduct to accomplish the wrongs complained of herein.  The purpose and effect of the conspiracy, common enterprise and/or common course of conduct complained of was, inter alia, to perpetrate the antitrust violations alleged herein and to obtain financial profits from their illegal acts.

**CLASS ACTION COMPLAINT**                                                                 5

20. Defendants accomplished their conspiracy, common enterprise and common course of conduct by concealing information and by taking steps and making statements in furtherance of their wrongdoing and false conduct as set forth below.

21. Each Defendant was a direct, necessary and substantial participant in the conspiracy, common enterprise and common course of conduct complained of herein, and was aware of its/his/her overall contribution to the actions in furtherance of the conspiracy, common enterprise and common course of conduct.

**F. ALTER EGO**

22. Plaintiff sues the Visa entities, and each of them, as participants, alter egos of one another, agents of one another, and conspirators with one another in the improper acts, plans, schemes, and transactions that are the subject of this Complaint.

## III. JURISDICTION AND VENUE

23. This Court has jurisdiction to hear Plaintiff's complaint, which solely alleges violations of California Law, including California's antitrust statute (the Cartwright Act, Business & Prof. C. §§ 16720 *et seq*) and Business and Professions Code § 17200.

24. Plaintiff and Defendants all operate out of San Mateo County. Plaintiff Broadway Grill, Inc.'s principal place of business is at 1400 Broadway Avenue, Burlingame, California 94010. Plaintiff transacts business only in San Mateo County. The Class consists solely of California merchants. All three Defendants are headquartered in Foster City (San Mateo County). Foster City is the location of Visa's "nerve center," regardless of which state each of the Visa-entities is incorporated in.

## IV. GLOSSARY OF RELEVANT TERMS

25. As noted by the Second Circuit in its June 30, 2016 Order rejecting the settlement in *In Re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, numerous Court opinions have included detailed information about how the credit industry operates, including descriptions and definitions the industry rules that Plaintiff alleges to be unlawful

merchant restraints. *Id.* *6. Similarly, definitions of key concepts are found in the relevant literature.[3]

26.     Plaintiff includes the following glossary of relevant terms, as those terms are used in this Complaint:

**A.     TYPES OF CARDS**

27.     **"General Purpose Credit and Charge Cards"** or **"GPC Cards"**: The main grouping of cards used by consumers, these include Visa-branded cards, and they allow consumers to access credit lines.

As noted by one District Court:

> Since the advent of the modern payment card industry in the 1950s, general purpose credit and charge cards, or "GPCC" cards, have become a principal means by which consumers in the United States purchase goods and services from the nation's millions of merchants. [Citation omitted] In 2013, for example, the four dominant networks providing authorization and settlement services—Visa, American Express, MasterCard, and Discover—facilitated roughly $2.399 trillion in credit and charge card spending at participating merchants. [Citation omitted] … Alongside general purpose credit and charge cards…merchants also accept payment through some combination of debit cards, proprietary or private label credit or charge cards issued by individual merchants, direct Automated Clearing House or "ACH" transfers, checks, and cash, among other means.[4]

28.     **"Credit cards"**: Credit cards enable cardholders to make purchases at participating merchants by accessing a line of credit extended to the cardholder by the issuer of that card. Cardholders are invoiced for purchases typically once per month and often have a grace period during which payment may be made. The delay between a purchase event and the cardholder's deadline for paying the bill on which that purchase appears is referred to as the "float," and it enables cardholders to temporarily defer payment on their purchases at no additional cost (i.e., without paying interest).  A cardholder may either pay off the balance of his bill in full each month or pay it off over time while accruing interest on the balance.  Many credit card issuers impose a

---

[3] Merchant Restraints: Credit-Card-Transaction Surcharging and Interchange-Fee Regulation in the Wake of Landmark Industry Changes, Samuel J. Merchant, Oklahoma Law Review, January 1, 2016. Available at: http://digitalcommons.law.ou.edu/cgi/viewcontent.cgi?article=1022&context=olr  (last visited July 5, 2016); Article: Settlement Without Consent: Assessing The Credit Card Merchant Fee Class Action, 2015 COLUM. BUS. L. REV. 186.
[4] *United States v. Am. Express Co.*, 88 F. Supp. 3d 143, 152-153 (E.D.N.Y. 2015).

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

1  preset spending limit on a cardholder's outstanding credit amount, typically based on the issuer's

2  determination of the cardholder's creditworthiness.[5]

3      29.   **"Charge cards"**: Charge cards similarly allow cardholders to make payments by

4  accessing a line of credit extended by the card issuer, but generally do not offer a revolving credit

5  facility akin to that offered on credit cards, and instead require that the cardholder pay the balance

6  in full each month. Even though charge cards typically are not paired with a line of credit,

7  cardholders generally derive a benefit from the ability to defer payment during the float period,

8  depending on the point during the billing cycle at which the purchase is made. Unlike credit cards,

9  charge cards typically do not have preset spending limits. Traditional American Express cards are

10  an example of a charge card.[6]

11      30.   **"Premium cards"**: Offer rewards and benefits to cardholder which are paid by the

12  merchant through higher Interchange Fees. Examples are cards that allow cardholders to "earn"

13  trips or merchandise.

14      **B.    GENERAL INDUSTRY TERMS**

15      31.   **"Acquiring Bank"**: The bank that acquires payment transactions from merchants.

16  Also referred to as the "Merchant's Bank." Acquiring Banks are members of Visa (or other card

17  associations, like MasterCard). Because they are members of the card associations, they enforce

18  the rules and regulations and fees of the card associations.

19      32.   **"Interchange Fee"**: When the Issuing Bank charges the cardholder for the amount

20  of their purchase, the Issuing Bank transmits the amount of the purchase through the network to

21  the Acquiring Bank, minus an "interchange fee" charged to the Acquiring Bank.[7] Under the

22  agreement by and among Visa and its member banks, the Interchange Fee is set by Association

23  rules. In a given transaction, the Interchange Fee that the Acquiring Bank pays (and is in turn paid

24  by the merchant) varies depending on the credit card network and the type of credit card used by

25

---

26  [5] *United States v. Am. Express Co.*, 88 F. Supp. 3d at 153.
    [6] *Id.* at 153-154.

27  [7] Merchant Restraints: Credit-Card-Transaction Surcharging and Interchange-Fee Regulation in the Wake of Landmark Industry Changes, Samuel J. Merchant, Oklahoma Law Review, January 1, 2016. Available at:

28  http://digitalcommons.law.ou.edu/cgi/viewcontent.cgi?article=1022&context=olr (last visited July 5, 2016); *Payment Card I*, 986 F. Supp. 2d at 214.

1  the consumer. For example, the American Express credit-card network generally charges a higher

2  Interchange Fee than the Visa or MasterCard networks. Furthermore, Visa and MasterCard have

3  different product levels within their credit card portfolios, such as cards that give consumers

4  generous rewards, and typically charge a higher Interchange Fee than cards that offer few rewards

5  or none. The difference in Interchange Fee between American Express and Visa or MasterCard is

6  one at the brand level, while the difference between, e.g., a rewards card from Visa and a no-

7  rewards card from Visa is one at the product level. *In re Payment Card Interchange Fee & Merch.*

8  *Disc. Antitrust Litig.*, 2016 U.S. App. LEXIS 12047, *7-8.

9      33. **"Issuing Bank"**: The bank that issues the card to the consumer. Issuing Banks are

10  members of Visa (or other card associations, like MasterCard). Because they are members of the

11  card associations, they enforce the rules and regulations and fees of the card associations. Issuing

12  Banks compete with one another for consumer business. As of December 31, 2015, J.P. Morgan

13  Chase, Bank of America, American Express, Capital One and Citi were the top issuers of U.S.

14  GPC Cards based on outstanding receivables.[8]

15      34. **"General Purpose Card Network"**: General purpose card networks provide the

16  infrastructure and mechanisms through which general purpose card transactions are conducted,

17  including the authorization, settlement, and clearance of transactions.[9]

18      35. **"Merchant Discount Fee"**: When an Acquiring Bank (the merchant's bank)

19  receives the purchase price minus the Interchange Fee from the Issuing Bank, the Acquiring Bank

20  forwards the amount minus a Merchant Discount Fee.[10] The merchant bears the full amount of the

21  Interchange Fee and the Merchant Discount Fee.[11]

22      36. **"Network Services"**: the assortment of services that Visa and other card

23  associations provide to merchants in order to complete payment card transactions, including

24  authorization, clearance and settlement of sales transactions by the Acquiring Bank from the

25  issuing Bank using the card-association's network.

26

27  [8] *See*, https://www.nilsonreport.com/publication_chart_and_graphs_archive.php (last visited July 11, 2016).
   [9] *United States v. Visa U.S.A., Inc.*, 344 F.3d at 239.

28  [10] *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2016 U.S. App. LEXIS 12047, *6-7.
   [11] *Id.*

37.   **"Payment Guarantee Services"**: Retail services offered to merchants to protect against fraud.

**C.    MARKETS**

38.   **"General Purpose Card Market"**: consisting of the market for charge cards and credit cards.[12]   In the market for general purpose cards, the issuers are the sellers, and cardholders are the buyers.[13]

39.   **"Market for General Purpose Card Network Services"**: In the market for general purpose card network services, the four networks themselves are the sellers, and the issuers of cards and merchants are the buyers.[14]   "Issuing banks purchase network services from MasterCard and/or Visa U.S.A., and those two brands compete with Amex and Discover for the banks' business.  Networks also compete for merchants, because the price merchants pay for acceptance of payment cards (the merchant discount) is affected by the size of the interchange fee, which is set by the network."  *United States v. Visa U.S.A., Inc.*, 344 F.3d at 239.

**D.    RELEVANT RULES OF VISA AND ITS CO-CONSPIRATORS**

40.   **"No Surcharge Rule"**: A rule which prohibits merchants from passing on the cost of (surcharging) Interchange Fees based on the product and/or brand used by a consumer.

41.   **"Honor-All-Cards Rule"**:  The "Honor-All-Cards Rule" requires merchants to accept all Visa or MasterCard credit cards if they accept any of them, regardless of the differences in Interchange Fees.[15]

42.   **"All-Outlets Rule"**: Association rule mandating that merchants with more than one outlet must accept Visa products in all outlets, even if the outlets do not share a common ownership structure, business model or brand name.

43.   **"No-Bypass Rule"**:  Prevents bypass of the Visa system, even when the Issuing Bank and the Acquiring Bank are the same.

---

[12] *See, United States v. Visa U.S.A., Inc.*, 344 F.3d at 238 (finding that the General Purpose Card Market is a relevant market.)
[13] *Id.* at 239.
[14] *Id.* at 239.
[15] *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2016 U.S. App. LEXIS 12047, *8.

44.   **"No-Multi-Issuer Rule"**: prevent merchants from using a credit card issued by one bank to process transactions through another bank.

45.   **"Anti-Steering Rules"**: "Anti-Steering Rules" include multiple rules prohibiting merchants from influencing customers to use one type of payment over another, such as cash rather than credit, or a credit card with a lower Interchange Fee.  These "anti-steering" rules include the "No-Surcharge Rule" and "No-Discount Rule," which prohibit merchants from charging different prices at the point of sale depending on the means of payment.[16]

46.   **"Merchant Restraints"**:  Over time Visa and its co-conspirators have used a host of rules to restrain competition, however, for purposes of this Complaint, Merchant Restraints refers to the following illegal rules: the No-Surcharge Rule, the Honor-All-Cards Rule, the All-Outlets Rule, the No-Bypass Rule and the No-Multi-Issuer Rule.

## V.   TRADE AND COMMERCE

47.   Defendants are engaged in commerce, and the unlawful activities alleged below have occurred in and have substantially affected California commerce.

48.   California's economy is now the sixth largest in the world.  California's economy dwarfs that of the next biggest state economy (Texas).  California's gross domestic product (GDP), the total value of goods and services produced here, was over $2.45 trillion in 2015.[17] California—with 12 percent of the U.S. population—accounts for 13 percent of the nation's output.[18]

## VI.   INJURY TO COMPETITION

49.   Defendants' conspiracy to fix Interchange Fees and to insulate those fees from competitive forces reduces merchant welfare and results in a transfer of wealth from merchants to Defendants and their member banks.  This is accomplished in at least the following ways:

---

[16] *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2016 U.S. App. LEXIS 12047, *8-9.
[17] U.S. Bureau of Economic Analysis (BEA) data released December 2015, accessible at: http://www.bea.gov/iTable/drilldown.cfm?reqid=70&stepnum=11&AreaTypeKeyGdp=5&GeoFipsGdp=XX&ClassK eyGdp=NAICS&ComponentKey=200&IndustryKey=1&YearGdp=2015Q2&YearGdpBegin=-1&YearGdpEnd=- 1&UnitOfMeasureKeyGdp=Levels&RankKeyGdp=1&Drill=1&nRange=5 (last accessed July 6, 2016).
[18] California Legislative Analyst's Office ("LAO"), http://www.lao.ca.gov/reports/2013/calfacts/calfacts_010213.aspx (last accessed July 6, 2016.)

- Supracompetitive Interchange Fees result in higher retail prices and lead to a reduction in output and economic welfare, causing cash customers, low-income customers, and other customers who use low-cost payment methods to subsidize credit card users, and standard card customers to subsidize high end or premium card users;[19]

- Supracompetitive Interchange Fees create incentives for issuing banks to encourage the use of high-cost payment methods rather than low-cost payment methods, encouraging inefficiency and misallocation of resources; and

- Supracompetitive Interchange Fees distort competition between payment methods in favor of products with the highest Interchange Fees.

50.     The collective setting of Interchange Fees and the Merchant Restraints by Visa member banks restrict competition among those banks for the provision of card network services to merchants. Absent Defendants' conspiracy, both Issuing and Acquiring Banks could have negotiated individually with retail merchants, and merchants would have been free to accept or reject the cards issued by particular issuing banks and to surcharge their customers for the use of such cards as appropriate. Under these circumstances, prices and output would be responsive to cost and consumer preferences rather than being set at monopolistic levels by a cartel of commercial banks.

## VII.   FACTUAL ALLEGATIONS

### A.     HISTORY OF VISA DEFENDANTS

51.     Visa was one of the first credit cards, although not the very first.  In 1951 Diners Club introduced a credit card, issuing cards to 200 customers who could use the card to charge the cost of meals at an initial 27 restaurants in the New York City area.  American Express also issued a limited credit card program focused on travel and entertainment.  Both early programs required customers to pay in full each month.

---

[19] As one commenter aptly observed: "In its worst form, food stamp consumers are subsidizing first-class frequent flier upgrades."  Professor Steven Semeraro labels this occurrence as "The Reverse-Robin Hood-Cross-Subsidy." *See*, Merchant Restraints: Credit-Card-Transaction Surcharging and Interchange-Fee Regulation in the Wake of Landmark Industry Changes, Samuel J. Merchant, Oklahoma Law Review, January 1, 2016. Available at: http://digitalcommons.law.ou.edu/cgi/viewcontent.cgi?article=1022&context=olr

52.     Visa—which has long been headquartered in the Bay Area—traces its roots back to 1958 when San Francisco based Bank of America established BankAmericard.  BankAmericard was a product targeting small merchants and middle-class consumers.  BankAmericard was initially rolled out in Fresno California, and in 1959 was rolled out throughout California. BankAmericard was unique in that it allowed card holders to make purchases at all participating merchants as opposed to only at one type of merchant (e.g., at restaurants, for travel, or at gas stations).  It also introduced rolling credit and variable credit limits.  The early BankAmericard system was cumbersome and fraud prone.  "Cards" were made of paper and required merchants to cross-check the account number in a printed book of valid numbers.

53.     BankAmericard grew at an astounding pace – within two years, by 1960, there were one million cardholders and 30,000 participating merchants.

54.     In 1966, Bank of America began licensing the card to banks across the country, creating the first nationally licensed general-use credit card program. By mid-1966 over 1.7 million cards were in circulation and there were 61,000 participating merchants.  By 1968, BankAmericard was accepted in most states with 41 issuing banks and 1,823 associated banks. BankAmericard also started to spread globally.

55.     By 1970 there were 100 million credit cards in circulation in the United States.  In 1970 all issuing banks formed National BankAmericard Incorporated, as an interbank card association for marketing in the U.S.

56.     In 1973 Visa unveiled the first electronic authorization system, called BASE I. It followed with BASE II in 1974, an electronic system for clearing and settling transactions among the banks that issue cards to consumers and "acquiring banks," which represent merchants.

57.     BankAmericard changed its name to Visa in 1976.

58.     On the cusp of the financial crisis in 2008 Visa went public.  Visa not only weathered the Great Recession it prospered with a 390% total shareholder return between 2009 and 2015.  In 2014 Visa had 60% operating profit margins on revenues of $12.7 billion.

59.     In 2015, The Nilson Report, a publication that tracks the credit card industry, found that Visa's global network (known as VisaNet) processed 100 billion transactions with a total

1  volume of $6.8 trillion dollars.  By transaction volume their network is approximately three times

2  larger than MasterCard and 14 times than American Express.

3    60.    Since its 2008 IPO, Visa's transaction volume has been growing at 10% a year.

4    61.    Modern day Visa is technologically efficient.  Visa places anticompetitive tariffs on

5  the card payments market structure.

6  **B.    SUMMARY OF RELEVANT FACTS REGARDING CREDIT CARD**

7  **       TRANSACTIONS AND HISTORY OF COMPETITION**

8    **1.    How Credit Card Transactions Work**

9    62.    In general terms, a Visa or credit card transaction is processed as follows: the

10  customer presents a credit card to pay for goods or services to the merchant—if the transaction is

11  accepted then the customer is obligated to pay the full purchase price to the Issuing Bank, along

12  with any fees and interest imposed on the consumer by the bank that issued the credit card.  Many

13  credit cards now provide "rewards" to customers which are essentially a rebate of some portion of

14  the merchant fee to the cardholder—these are referred to as premium cards.

15    63.    Upon swiping the customer's card (or more infrequently, keying in the card

16  number), the merchant relays the transaction information to the Acquiring Bank; the Acquiring

17  Bank processes the information and relays it to the network (here, Visa); the network relays the

18  information to the Issuing Bank; if the Issuing Bank approves the transaction, that approval is

19  relayed to the Acquiring Bank, which then relays it to the merchant. (All these steps are now

20  handled electronically).

21    64.    If the transaction is approved, the Issuing Bank promptly pays the merchant's bank

22  (also called the Acquiring Bank) the purchase price less the card issuer's cut, known as the

23  Interchange Fee.  The merchant's bank then deposits into the merchant's account the funds

24  received from the card issuer less the merchant bank's cut.  The two fees together are referred to as

25  the "Merchant Discount Fee." Typically the card-Issuing Bank receives about three quarters of the

26  fees that are charged to the merchant.

27    65.    In a given transaction, the Interchange Fee that the Acquiring Bank pays (and is in

28  turn paid by the merchant) varies depending on the credit card network and the type of credit card.

Thus, the American Express credit-card network generally charges a higher Interchange Fee than the Visa or MasterCard networks.  And Visa and MasterCard have different product levels within their credit card portfolios, such as cards that give consumers generous rewards, and typically charge a higher interchange fee than cards that offer few rewards or none.  The difference in Interchange Fee between American Express and Visa or MasterCard is one at the brand level, while the difference between, e.g., a rewards card from Visa and a no-rewards card from Visa is one at the product level.

### 2.     Merchant Concern With Card Acceptance Fees

66.     Both economies of scale and intense competition and sharply reduced this component of fee paid by merchants.   The problem is instead the fee that merchants pay to the card-Issuing Banks (as stated previously, the card-Issuing Bank receives the bulk of the fees charged the merchant).  In contrast to the high level of competition between merchant banks, card-issuers do not compete for merchant acceptance. Visa (and MasterCard) set default rates that each Issuing Bank accepts. The Visa (and MasterCard) network rules prohibit merchants from refusing to accept - or discriminating against - a particular bank's cards, regardless of the costs associated with a given card.  These restraints are unilaterally imposed on merchants who must accept them as a condition of taking credit cards.

67.     The so-called Honor-All-Cards Rules prohibit a merchant, for example, from refusing to accept Wells Fargo cards while continuing to accept other Visa cards. Because a merchant may not force a bank to compete by threatening to stop accepting, or surcharging, its cards, each issuer can maximize its own profit by accepting the collectively-set default Interchange Fee. This means that in practice there is no way that a merchant such as the Broadway Grill can negotiate with Issuing Banks for a better Interchange Fee deal.

### 3.     Growth of Anticompetitive Conduct in the Setting of Interchange Fees

68.     Anticompetitive conduct grew with the exponential growth of the use of credit cards (as chronicled in Section VII(B)).  Between 1970 and the mid-1990s merchants voiced few objections to collectively set Interchange Fees—mainly because it was still possible during this time frame for a merchant to survive without accepting credit cards.  Customers were still familiar

1  with paying with cash and checks.  During this time period there was competition between

2  American Express and Visa/MasterCard as they sought to build the largest merchant network—

3  this competition kept fees under check.  In addition, from the early 1980s until the early 1990s,

4  American Express offered fee discounts to merchants and restaurants if they accepted only

5  American Express and no other card.  Again, the effect was to keep fees down.

6       69.    As the market became mature (which it is currently), merchant fees rose despite

7  declining transaction processing costs.  Controversy regarding merchant fees has been increasing

8  since the mid-1990s.  Since the mid-1990s, banking systems have continuously become more

9  technologically advanced.  Fraud losses have continued to decrease.  And, market share for credit

10  card transactions (versus other payment options) has increased.  Absent anti-competitive behavior,

11  these factors should have led to decreasing merchant fees; however, merchant fees have steadily

12  increased.

13       70.    In 1986, 55 percent of households held credit cards—by 2006 77 percent of

14  households held a credit card, with most holding multiple cards.  During this period transaction

15  volume also increased from 3 percent of consumer expenditures to 25 percent.  By 2012, two

16  thirds of in-person sales are made with payment cards, about half of those with credit cards.

17       71.    In 2013 U.S. personal expenditures on credit cards amounted to $2.49 trillion.

18  Economists expect this number to increase by 65%--to $4.11 trillion by 2018.[20]  In 2013, 93.32

19  billion credit, debit, and electronic bank-transfer transactions were processed in the United States.

20  *Id.* at 11.  A large portion of these transactions occurred in California given California's rank as the

21  most populous state in the United States.  According to U.S. Census data, California had 12.07 %

22  of the population in 2010 with 37,253,956 citizens.[21]

23       72.    Instead of falling Interchange Fees, Interchange Fees have risen.  Between 1995 and

24  2005, the Interchange Fee paid to issuing banks rose more than 25 percent.  Given the dependence

25

26

27  [20] *Consumer Payment Systems in the U.S. 2013 vs. 2018*, NILSON REP. (HSN Consultants, Inc., Carpinteria, Cal.), Dec. 2014, at 1.

28  [21] Date available at *United States Census 2010*, U.S. CENSUS BUREAU, http://www.census.gov/2010census/ (last visited July 5, 2016.)

1  of the purchasing public on credit cards there was no realistic ability for merchants to refuse to

2  accept credit cards and survive.

3       73.    Somewhere in the range of 60-80% of credit card companies' revenue comes

4  directly from merchants like Plaintiff.[22]  Visa and MasterCard imposed $35.56 billion in credit

5  processing fees on U.S. merchants in 2013.[23]  This is nearly three times the $12.75 billion in debt

6  card processing fees in 2013, despite the fact that the fees were charged on nearly the same

7  purchase volume of $1.6 trillion.  *Id.*

8       74.    Although there is competition between merchant banks, Visa (and MasterCard)

9  generally treats Interchange Fees as non-negotiable.  Merchants pay much higher Interchange Fees

10  than they would have to pay in a competitive market.  Merchants big and small oppose the current

11  system of interchange rules involving unlawful practices.  This is demonstrated by the existence of

12  cases brought by Wal-Mart and other large retailers.  Even state and federal governments are

13  beholden to Visa and its co-conspirators.  In 2007 the United States government paid $433 million

14  in credit card fees—mostly Interchange Fees.[24]  While there have been limited instances of mega-

15  retailers, like Wal-Mart, negotiating small concessions over fees, networks were unwilling to

16  negotiate with the U.S. Government to lower Interchange Fees.  *Id.*  This evidences the shocking

17  imbalance of negotiating power between merchants and credit card companies.

18       75.    Small businesses' hands are tied.  Small businesses constitute 99.7% of business in

19  the United States[25] and contribute 46% of the Gross Domestic Product.[26]  They have no ability to

20  negotiate terms with Visa and its co-conspirators.

21

22  [22] *See*, Merchant Restraints: Credit-Card-Transaction Surcharging and Interchange-Fee Regulation in the Wake of
Landmark Industry Changes, Samuel J. Merchant, Oklahoma Law Review, January 1, 2016, at 328. Available at:

23  http://digitalcommons.law.ou.edu/cgi/viewcontent.cgi?article=1022&context=olr (last visited July 5, 2016).
[23] Merchant Processing Fees in the U.S., NILSON REP. (HSN Consultants Inc., Carpinteria, Cal.), May 2014, at 12

24  (excluding private label cards). The weighted average fee for all Visa and MasterCard credit cards was 2.17% in 2013,
while the same average for debit cards was almost a third, or 0.76%. *Id.*

25  [24] 156 Cong. Rec. 4977 (2010) (comments of Senator Durbin).
[25] Small Business Facts & Data, SMALL BUS. & ENTREPRENEURSHIP COUNCIL,

26  http://www.sbecouncil.org/about-us/facts-and-data/ (last visited July 5, 2016) ("Firms with fewer than 500 workers
accounted for 99.7 percent of those businesses, and businesses with less than 20 workers made up 89.8 percent. Add in

27  the number of nonemployer firms . . . and the share of U.S. businesses with less than 500 workers increases to 99.9
percent, and firms with less than 20 workers increases to 98 percent.")

28  [26] Kathryn Kobe, Small Business GDP: Update 2002-2010, SBA OFF. ADVOC. 4, 14 (Jan. 2012),
http://www.sba.gov/sites/default/files/rs390tot_1.pdf.

#### 4. Networks Adopt Uniform Anti-Competitive Rules

76. Defendants (along with co-conspirator MasterCard) fixed the Interchange Fee through a two part process:

77. First, Visa and MasterCard set a default interchange rate that all banks could accept. Second, Visa and MasterCard adopted a set of nearly identical rules, called the "Honor-All-Cards-Rule" which has the effect of insulating card-issuing banks from competition on merchant acceptance fees. The "Honor-All-Cards-Rule" prohibits merchants from dropping one issuer's cards while continuing to accept those issued by other banks within the network. (e.g., Plaintiff cannot decide to accept Citibank branded Visa cards but not Wells Fargo branded Visa cards). As a result, the default interchange rate was adopted by default by virtually all card-issuing banks. There was no incentive for card-issuing banks to set competitive interchange rates since merchants were bound to accept all Visa cards or none at all.

78. In addition, Visa (and MasterCard) rules prohibit merchants from steering customers towards lower-cost payment mechanisms (the Anti-Steering rule.)  Similarly they impose No-Discount Rule and No-Surcharge Rule.

79. These rules allow Visa (and MasterCard) and their member banks to leverage the networks' market power to set interchange fees at supra-competitive levels.

80. While Visa is an independent business entity from MasterCard, the Honor-All-Cards-Rule makes the two networks partners in setting default Interchange Fees. There is simply no incentive for Issuing Banks to set lesser fees.

81. Plaintiff and the Class it seeks to represent are all California merchants who accept Visa branded credit cards and are therefore bound by Visa's network rules. They are damaged by the "default interchange" fee, the Honor-All-Cards-Rule, and the Anti-Steering Rule including the No-Surcharge Rule.

82. Visa, which works in tandem with its co-conspirators MasterCard and the Issuing Banks, impose artificially inflated Interchange Fees that merchants are forced to accept.

83. While certain recent developments have curbed some abuse, they have left in place the Honor-All-Cards-Rule and the resulting default Interchange Fee. Merchants are still left to

1    bear supra-competitive Interchange Fees that would not persist but for the complained of anti-
2    competitive conduct.

3        84.     The "Durbin Amendment" to the Dodd-Frank Wall Street Reform and Consumer
4    Protection Act of 2010 limited the Interchange Fee that issuing banks could charge for debit card
5    purchases, and allowed merchants to discount debit card purchases relative to credit card
6    purchases.  Also, pursuant to a consent decree with the Department of Justice in 2011, Visa and
7    MasterCard agreed to permit merchants to discount transactions to steer consumers away from
8    credit cards use.  Finally, it should be noted that California was one of several states that passed
9    no-surcharge legislation after heavy lobbying by the credit card industry.  Passed in 1985
10   California's Civil Code Section 1748.1 codified Defendants' No-Surcharge Rule—this law has
11   since been found to be unconstitutional and a District Court has enjoined its enforcement.  *Italian*
12   *Colors Rest. v. Harris*, 99 F. Supp. 3d 1199, 1203 (E.D. Cal. 2015).

13       85.     None of these developments affects the Honor-All-Cards Rule or the existence of a
14   supracompetitive default interchange fee.

15       86.     Legislative efforts in other countries to combat Defendants' anti-competitive
16   behavior demonstrate the cost of the behavior on consumers.  Australia is a prime example of a
17   country that has started extensive regulation of interchange fees.  The result has been the adoption
18   of surcharges by many merchants and changes in consumer choices regarding purchase methods.

19   **VIII.   *AMERICAN PIPE* TOLLING APPLLIES**

20       87.     Under the *American Pipe* tolling doctrine (*American Pipe & Construction Co. v.*
21   *Utah*, 414 U.S. 538 (1974)) which has been adopted by the Courts of the State of California, the
22   statute of limitations for Plaintiff to bring the claims alleged in this case was tolled during the
23   pendency of the *In Re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*
24   MDL, which concluded with the Second Circuit's June 30, 2016 decision vacating class
25   certification and reversing approval of the settlement.  *See, Jolly v. Eli Lilly & Co.*, 44 Cal. 3d
26   1103, 1119, 1126 (1988)(California has adopted *American Pipe* tolling); *Falk v. Children's*
27   *Hospital Los Angeles* (2015) 237 Cal.App.4th 1454, 1470 (under *American Pipe* tolling doctrine,
28   second class action may "piggyback" or be "stacked" after first class action).

1   88.   Notably, the claims at issue here (although brought only under California law) are

2   substantially similar to those at issue in the MDL, and involve the same subject matter and

3   evidence.

4   **IX.   CLASS ALLEGATIONS**

5   89.   The following Class may properly be maintained as a class action pursuant to

6   California Code of Civil Procedure section 382:

7   **Class Definition**:

8   **All California individuals, businesses and other entities who accepted Visa-Branded**

9   **Cards in California since January 1, 2004 and continuing through the date of trial**

10  **(the "Class").**

11  90.   Excluded from the Class are: Visa, its officers, directors and employees, and any

12  entity in which Visa has a controlling interest, the agents, affiliates, legal representatives, heirs,

13  attorneys at law, attorneys in fact or assignees thereof, and the Court.

14  91.   Throughout discovery in this litigation, Plaintiff may find it appropriate and/or

15  necessary to amend the definition of the Class. Plaintiff will formally define and designate a class

16  definition when it seeks to certify the Class alleged herein.

17  **Ascertainable Class**: The Class is ascertainable in that each member can be identified

18  using information contained in Visa's records.

19  **Common Questions of Law or Fact Predominate**: There is a well-defined community of

20  interest among the Class. The questions of law and fact common to the Class predominate over

21  questions which may affect individual Class members. These questions of law and fact include, but

22  are not limited to, the following:

23  a.   Whether Visa's No-Surcharge Rule violated the Cartwright Act;

24  b.   Whether Visa's Honor-all-Cards Rule violates the Cartwright Act;

25  c.   Whether Visa's No-Outlets Rule violates the Cartwright Act;

26  d.   Whether Visa's No-Bypass Rule violates the Cartwright Act;

27  e.   Whether Visa's No-Multi-Issuer Rule violates the Cartwright Act;

28  f.   Whether Visa's Merchant Restraints as a whole violate the Cartwright Act;

g.   Whether Visa has set Interchange Fees at supracompetitive levels;

h.   Whether Visa has conspired with other credit card networks to violate the law;

i.   Whether Visa has conspired with Issuing Banks to violate the law;

j.   Whether Visa has conspired with Acquiring Banks to violate the law;

k.   Whether Visa's business practices are unfair under California's Unfair Competition Law; and,

l.   Whether Visa's business practices are unlawful under California's Unfair Competition Law

**Numerosity**: The Class is so numerous that the individual joinder of all members of the Class is impractical under the circumstances of this case. While the exact number of members of the Class is unknown to Plaintiff at this time, Plaintiff is informed and believes the Class consists of tens of thousands of members. Individual joinder of members of the Class is also impracticable because the individual Class members are dispersed throughout the state of California.

**Typicality**: Plaintiff's claims are typical of those of the other Class members because Plaintiff, like every other Class member, was exposed to virtually identical conduct.

**Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Class in that it has have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages it has suffered is typical of all other Class members. Plaintiff has retained competent counsel, experienced in class action litigation and antitrust law.

**Superiority**: The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and the Class for the wrongs alleged because:

a.   The individual amounts of damages involved, while not insubstantial, are such that individual actions or other individual remedies are impracticable and litigating individual actions would be too costly;

b.  If each Class member was required to file an individual lawsuit, Visa would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class member with vastly superior financial and legal resources;

c.  The costs of individual suits could unreasonably consume the amounts that would be recovered;

d.  Proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each member of the Class to recover on the cause of action alleged; and

e.  Individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

## X.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### Violation of California Antitrust Law

#### (On Behalf of Plaintiff and Class)

#### (Against All Defendants)

92.  Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

93.  Defendants created, operated, aided, or abetted a trust, or combination, of Issuing and Acquiring Banks by fixing, controlling, or maintaining prices in violation of the state antitrust statutes listed below.

94.  As set forth herein, Defendants created, operated, aided, or abetted a trust, or combination of Issuing and Acquiring Banks by fixing, controlling, or maintaining prices in violation of the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 et seq.  Defendants' unlawful conduct had the following effects: (1) the credit card processing price competition and output were restrained, suppressed, and eliminated throughout California; (2) the price of credit card processing was raised, fixed, maintained, and stabilized at artificially high levels throughout California; (3) Plaintiff was deprived of free and open competition; (4) Plaintiff paid

1　supracompetitive, artificially inflated Interchange Fees for credit card processing; (4) Plaintiff has

2　been forced to bear the costs of Premium Cards, footing the bill for high-cost rewards programs,

3　that benefit Defendants and their Networks at the cost of merchants.

4　　　　95.　　Defendants and their co-conspirators conspired to fix the prices for Interchange

5　Fees. United by their common interests, Defendants colluded to substantially limit, lessen, and

6　exclude competition. Defendants increased Interchange Fees over time despite their own decreased

7　fixed costs, which prevented and restrained trade and commerce. With the ability to preclude free

8　and unrestricted competition, Defendants increased the price they charged to merchants for

9　processing credit and debit card transactions.　At the same time Defendants imposed onerous terms

10　and conditions on merchants that prevented merchants from surcharging transactions in accordance

11　to the cost of the transaction to the merchant versus alternate payment options.　Defendants also

12　required Defendants to accept all or none of their products, even though some products were more

13　attractive than others.　Defendants also prevented Plaintiff and the Class from informing customers

14　of the costs imposed on merchants by Defendants.

15　　　　96.　　Plaintiff suffered a loss of money or property from the supracompetitive, artificially

16　inflated prices.

17　　　　97.　　Defendants' conduct is a substantial factor in Plaintiff's loss. The loss was a direct

18　and proximate result of Defendants' willful price-fixing conspiracy.　Plaintiff incurred

19　supracompetitive, artificially inflated Interchange Fees because Defendants fixed prices after

20　Defendants precluded free and unrestricted competition.

21　　　　98.　　Defendants created, operated, aided, or abetted a trust with the purpose of fixing,

22　controlling, or maintaining prices of Network Services and supporting technology, in violation of

23　the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, et seq., and Plaintiff seeks

24　damages pursuant to Cal. Bus. & Prof. Code § 16750.

25

26

27

28　///

## SECOND CAUSE OF ACTION

### Violation of California Business And Professions Code § 17200, *Et Seq.*

### Unlawful Business Acts And Practices

### (On Behalf of Plaintiff And Class)

### (Against All Defendants)

99.　Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

100.　Business & Professions Code section 17200, *et seq.* prohibits acts of "unfair competition" which is defined by Business & Professions Code section 17200 as including any "any unlawful, unfair or fraudulent business act or practice . . . ."

101.　Defendants have violated and continue to violate Business & Professions Code section 17200's prohibition against engaging in "unlawful" business acts or practices, by, *inter alia*, Violating the Cartwright Act, Business and Professions Code § 16700 *et seq.* (as alleged herein);

102.　Plaintiff suffered injury in fact and lost money and/or property as a result of Defendants' unlawful business acts and practices and Class members have suffered harm when each was required to pay inflated Interchange Fees to Defendants and their networks, including Issuing Banks in excess of what they would have paid had Defendants allowed surcharges based on the type of payment product used, and had Defendants permitted merchants to select specific payment products to accept, and had Defendants permitted merchants to communicate information to customers regarding the hefty fees imposed on merchants depending on the type of payment product, and had Defendants permitted merchants to express preferences for one product over another to customers.

103.　As a result of Defendants' violations of the Business & Professions Code section 17200, *et seq.*, Plaintiff and Class members are entitled to equitable relief in the form of full restitution of all monies paid beyond the fair market value of the Network Services provided, including, but not limited to amounts associated with the rewards programs associated with Premium Cards.

## **THIRD CAUSE OF ACTION**

### **Violation of California Business And Professions Code § 17200, *Et Seq.***

### **Unfair Business Acts And Practices**

### **(On Behalf of Plaintiff And Class)**

### **(Against All Defendants)**

104.    Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

105.    Such acts of Defendants, as described above, constitute unfair business acts and practices.

106.    Defendant's conduct does not benefit merchants or competition.  Indeed the injury to merchants and competition is substantial.

107.    The gravity of the consequences of Defendants' conduct as described above outweighs any justification, motive or reason therefore and is immoral, unethical, oppressive, unscrupulous, and offends established public policy.

108.    Plaintiff suffered injury in fact and lost money and/or property as a result of Defendants' unfair business acts and practices and Class members have suffered harm when each was required to pay inflated Interchange Fees to Defendants and their networks, including Issuing Banks in excess of what they would have paid had Defendants allowed surcharges based on the type of payment product used, and had Defendants permitted merchants to select specific payment products to accept, and had Defendants permitted merchants to communicate information to customers regarding the hefty fees imposed on merchants depending on the type of payment product, and had Defendants permitted merchants to express preferences for one product over another to customers.

109.    As a result of Defendants' violations of the Business & Professions Code section 17200, *et seq.*, Plaintiff and Class members are entitled to equitable relief in the form of full restitution of all monies paid beyond the fair market value of the Network Services provided, including, but not limited to amounts associated with the rewards programs associated with Premium Cards.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays as follows:

110.    That the Court determine that the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have violated California's Antitrust Laws.

111.    That judgment be entered for Plaintiff and the Class against Defendants for damages sustained by Plaintiffs and the Class and/or trebling of damages as provided by the Cartwright Act and/or restitution as allowed by law.

112.    That Plaintiffs and the Class recover pre-judgment and post-judgment interest as permitted by law.

113.    That Plaintiff and the Class recover their costs of the suit, including attorneys' fees, as provided by law.

114.    For such other and further relief as is just and proper under the circumstances.


Dated:  July 12, 2016                    **COTCHETT, PITRE & McCARTHY, LLP**

                                         By: _____
                                              JOSEPH W. COTCHETT
                                              ANNE MARIE MURPHY

                                              *Attorneys for Plaintiffs*


**JURY DEMAND**

Plaintiff demands a jury trial on all issues so triable.


Dated:  July 12, 2016                    **COTCHETT, PITRE & McCARTHY, LLP**

                                         By: _____
                                              JOSEPH W. COTCHETT
                                              ANNE MARIE MURPHY

                                              *Attorneys for Plaintiffs*